**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

**United States of America,**

    Plaintiff,

    v.

**Ehbrin Castro-Correa,**

    Defendant.

CRIMINAL NO. 16-153 (PG)

## OPINION AND ORDER

On March 5, 2016, the United States filed a criminal complaint against the defendant, Ehbrin Castro-Correa, see Docket No. 1, who was thereafter charged by a grand jury of knowingly and unlawfully possessing and training an animal for purposes of having the animal participate in an animal fighting venture, in violation of 7 U.S.C. § 2156(b). See Docket No. 5.

Pending before the court is the defendant's motion to suppress the evidence against him (Docket No. 40), and the United States' response in opposition (Docket No. 49). The court held an evidentiary hearing on May 2, 2017. For the reasons explained below, the court finds that the defendant's warrantless arrest was lawful, that he voluntarily consented to the searches he now challenges, and that in any case, well-recognized exceptions carved under the Fourth Amendment justified the warrantless search. As such, the motion to suppress is **DENIED.**

### I.   FACTUAL FINDINGS[1]

The charges against the defendant stem from an investigation conducted on March 4, 2016, at the Pan American Pier (or the "PanAm Dock") in San Juan, Puerto Rico, after law enforcement agents observed Castro-Correa arrive in a white pickup truck with six canines onboard.[2] The defendant proceeded to the check-in and luggage drop-off area at the cruise ship terminals, dropped off the canines (still inside the crates), and walked over to the boarding area where the Caribbean Fantasy Ferry was docked. There, he showed U.S. Customs and Border Protection ("CBP") officers a boarding pass, which identified the defendant as a passenger set to travel onboard the ferry to the Dominican Republic along with pets.

---

[1] The court's findings are based on the evidence on record and the Transcript of Suppression Hearing ("Transcript") held on May 2, 2017, which neither party requested.

[2] The canines were being transported inside individual crates on the pickup truck bed.

After having the opportunity to examine the testimony proffered at the suppression hearing by the law enforcement agent who investigated the case and the defendant, and taking into account their demeanor and credibility, the court makes the following findings of fact.

### *Special Agent Arturo D. Colon-Anguita*

Special Agent Arturo D. Colon-Anguita works for the U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations (HSI) since May of 2010.[3] On the date of the events relevant to this case, SA Colon was assigned to the HSI office in San Juan, Puerto Rico. At the hearing, he explained that ICE and CBP are tasked with, among others, monitoring and preventing the entrance of contraband and other illegal activities at the port of entry.[4]

#### THE INVESTIGATION

On the afternoon of March 4, 2016, SA Colon and fellow HSI officers arrived at the PanAm Dock in San Juan after receiving information that an individual was scheduled to travel to the Dominican Republic in order to export canines for fighting ventures. At approximately 4:45 p.m., SA Colon observed the defendant arrive at the location in a pickup truck with six kennels, each one containing a dog inside. The defendant proceeded to the Caribbean Fantasy Ferry's check-in desk, checked himself in, dropped off the kennels at the cargo area (the dogs still inside), and presented his boarding pass and passport to CBP. See Transcript at 8; Government's Exhibit 2 (photograph of the six crates later seized). When he walked over to the boarding area that led towards the ferry, he was approached by SA Colon and his team for a secondary inspection.[5]

#### THE SECONDARY INSPECTION

During this inspection, SA Colon and his fellow agents informed Castro-Correa that his cellular phone would be searched. The defendant acquiesced and gave them the passcode to unlock the device. See Transcript at 10:6-10 and 11:20-25. The search yielded what SA Colon believed to be evidence of suspected animal cruelty. Specifically, SA Colon found several video clips containing

---

[3] SA Colon has completed several training programs related to criminal investigations, to wit, the Basic Import Specialist Training, the Commercial Fraud Investigations Course, the Criminal Investigator Training Program, and the ICE Special Agent Training. See Docket No. 1-1 at 1.

[4] The port of entry is a term used to refer to entry and exit ports of the United States and U.S. territories.

[5] By then, the agents had already received and corroborated the information implicating Castro-Correa in illegal dog fighting activity.

The court also notes that the affidavit submitted by SA Colon in support of the arrest warrant indicates that every individual traveling with canines onboard the Ferry that day also underwent a secondary inspection. Docket Nos. 1-1 or 49-3, at 2.

depictions of dogfighting.[6] Id. at 12-13; Government's Exhibits 5-14. One of the videos showed two dogs engaged in a fight with three individuals around them, encouraging them to fight. Id. at 13:20-22. The video also captured the wounds and blood loss sustained by the animals, as well as the blood spills on the surface of the dog-fighting pit.

**POST-MIRANDA INTERROGATION**

SA Colon and a fellow agent proceeded to Mirandize Castro-Correa. At approximately 6:35 p.m., SA Colon read the defendant his Miranda rights and provided him with a voluntary waiver form. Castro-Correa acknowledged that he understood his rights and the contents of the waiver form, which he then signed. Id. at 15; Docket No. 50-1. The agents asked the defendant about his travel plans and the video found on his phone. Castro-Correa answered that he intended to export the six canines he was traveling with to the Dominican Republic for conformation and dogfighting competitions. Id. at 18. Moreover, during this time, he admitted not only that he had filmed the video found by SA Colon when searching his phone, but also that he owned one of the dogs there shown and that he trained dogs for dogfighting and competition.[7] Id. at 16-18; see also Docket No. 49-3 at 4.

Castro-Correa confessed that he had twenty-five other dogs at his residence. Id. at 18 and 22:12-13. The agents provided the defendant with a "consent to search form," which advises the signee of his right to refuse consent and that any evidence found during the search may be used against him in a subsequent criminal proceeding. See Docket No. 49-2. Castro-Correa signed the consent form, thus authorizing the agents to conduct a complete search of his home. Id. at 18-19; Government's Exhibit 4. With the video clips found during the search and the defendant's confession and consent in tow, the agents contacted AUSA Mariana Bauza and informed her of the facts recounted thus far. At approximately 6:45 p.m., she instructed the agents to place Castro-Correa under arrest. Id. at 20.

**THE ARREST**

The agents took Castro-Correa to the HSI field office located in Miramar, San Juan, for booking. As part of that process, the agents asked the Mirandized defendant a series of standard questions (e.g., name and date of birth), took

---

[6] SA Colon conducted the phone search by looking at recent multimedia files stored on the phone, including those transmitted via WhatsApp, an instant messaging application for smartphones.

[7] The defendant also specified that he filmed the video in Juncos, Puerto Rico. See Transcript at 16-17. It was saved on his smartphone with January 24, 2016, as its date.

photographs of the defendant, his fingerprints and a DNA sample. He was placed in a cell thereafter. Id. at 21.

**THE PROTECTIVE SWEEP AND PRELIMINARY SEARCH**

Due to logistics and operational concerns, SA Colon requested additional personnel in order to conduct the search of the defendant's home, which he had consented to earlier.[8] At nighttime, SA Colon, his team and the defendant left the HSI office in Miramar and headed towards Castro-Correa's residence, located in Rio Grande, Puerto Rico. Id. at 21. They stopped at a shopping center in Rio Grande and waited for the other HSI agents to arrive. By then, an operational plan had been signed. Id. When the other agents arrived, the team discussed safety measures and other details related to the operation (e.g., the perimeter of the search) before driving towards the defendant's residence. Given the location of the neighborhood and precise site of the house itself, Castro-Correa had to provide the agents with driving directions.[9] Id. at 21-22.

At approximately 11:30 p.m., the group arrived at Castro-Correa's home. There, SA Colon and his team conducted a security sweep inside the residence and secured the area. During that time, they identified the canines. The defendant remained handcuffed, hands in front. Based on the defendant's consent, the agents carried out a preliminary search of the residence in order to secure the property. Inside, the agents identified a medications for dogs, syringes, and a man-made treadmill which SA Colon believed was designed for dog training. They also found twenty-five dogs – 9 puppies and 16 adults – that were either chained, tied to a structure or caged, and exposed to deplorable conditions. Id. at 22-23; see also Docket No. 49-3 at 6.

**THE WARRANTS**

At approximately 1:30 a.m. on the Saturday of March 5, 2016, SA Colon left the defendant's residence, with Castro-Correa, and returned to the metropolitan area in order to secure warrants. Castro-Correa was transported to the Metropolitan Detention Center ("MDC") in the municipality of Guaynabo, where he was placed in a cell. Id. at 23. SA Colon then headed towards the HSI office in Miramar to prepare the affidavits needed for the criminal complaint and the arrest and search warrants. Some of his fellow agents remained at the scene in

---

[8] SA Colon testified that additional HSI manpower was needed to transport the six canines seized at the PanAm Dock, as well as the other canines he believed would be found in Castro-Correa's home.

[9] The agents had received information that the neighborhood where the defendant lived was dangerous. Id. at 21. SA Colon also stated that the residence was "hard to get [to]…[,]" as "[i]t was very deep into the neighborhood." Id. at 21:21-22.

order to secure the property and prevent the loss of evidence. Id. at 23 and 35. Afterwards, he went to the United States Attorney's Office in Hato Rey, San Juan, where AUSA Bauza and AUSA Dina Avila reviewed the affidavits.

Next, SA Colon drove to U.S. Magistrate Judge Bruce McGiverin's home in Cidra.[10] Between 4:20 p.m. and 4:40 p.m., the Magistrate signed the following five warrants: **(1)** 16-372 (M), Criminal Complaint and Affidavit authorizing the warrant for Castro-Correa's arrest; **(2)** 16-373 (M), seizure warrant for the 25 canines found at the defendant's residence; **(3)** 16-374 (M), seizure warrant for the six canines identified at the PanAm Dock; **(4)** 16-375 (M), search warrant for the defendant's phone; **(5)** 16-376, search warrant for the defendant's residence. Id. at 24-26; see Docket No. 49-3 (Exhibit 3).

### THE SEARCH AND SEIZURE

Upon obtaining the Magistrate Judge's signature, SA Colon called the agents present at the residence and instructed them to carry out the search. He then drove back to the residence and participated in the search, where the agents seized the canines, documents and memorabilia related to dogfighting, dog medications, a pry bar, treadmills and other training equipment. In addition, the agents searched the defendant's phone, where they found more photos and videos depicting training methods, dogfighting and related forms of animal cruelty.

#### *Ehbrin Castro-Correa*

At the evidentiary hearing, Castro-Correa took the witness stand and gave an awry version of the events. To wit, the defendant said that during the border search on March 4, 2016, he told CBP that the purpose of his trip was to take a vacation. However, during the secondary inspection, he allegedly explained to one of the agents that he was "hired, basically, to transport those animals," and "that [he] was doing … a favor." Id. at 45:12-14.

Also, the defendant said that during the border search he told a CBP officer that he was the owner of the six dogs. Id. at 41:13-14. Later on, he changed tunes; he said that at the secondary inspection he explained the dogs were not his. And *because* they were not his, he could not guarantee if they were being exported for dogfighting ventures. Id. at 47:9-13 and 48:10-11.

When asked about the health certificates required for canine travel, the defendant (again) stumbled. Now, at that point Castro-Correa had testified that:

---

[10] The municipality of Cidra is located in the central region of Puerto Rico. It is about an hour drive from Hato Rey, San Juan to Cidra.

"in January I had found this person who was going to work on the doors and windows for [sic] my house … [T]he day before, on Thursday, **they** contacted me to see if I could take some animals to Santo Domingo." Id. at 46:20-25 and 47:1-8.

The defendant further admitted that the dogs' health certificates had been issued under his name. And he explained why: "they were in my name because I was the one who would deliver them to the country … and the dog cannot travel unaccompanied. It has to have a representative." So when the court asked Castro-Correa if his friend, Michael (the one he was doing the favor for), gave him the dogs' health certificates on Thursday, March 3rd, Castro-Correa answered "no." The court inquired into the matter further:

| | |
|---|---|
| The court: | You had it beforehand? |
| The witness: | Yes. No, no. That document, I am the one that gets the document. I am the one that had to take that document out under my name because those dogs are going to be traveling with me. |
| The court: | And when did you take out that document? |
| The witness: | On Thursday. Thursday afternoon. |
| | … |
| The court: | And where did you get the certificates for the dogs, the health certificates? |
| The witness: | Since I live in Rio Grande, there is a veterinary clinic in Luquillo … So I took the animals there. |
| The court: | Did Michael take [the animals] to your house? |
| The witness: | No, I picked them up. |
| The court: | Where? |
| The witness: | Moca.[11] |

Considering the inconsistencies highlighted above, the court finds that defendant's testimony is, for lack of a better word, incredible.

## II. DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Police searches are constrained by the Fourth Amendment's reasonableness requirement...." United States v. McGhee, 627 F.3d 454 (1st Cir. 2010). "A 'search' occurs when an expectation of privacy that

---

[11] Moca is a municipality located in the northern-western region of Puerto Rico.

society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." <u>United States v. Jacobsen</u>, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). With limited exceptions, warrantless searches are *per se* unreasonable. <u>See</u> <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 454–55, 91 S.Ct. 2022 (1971); <u>see also</u> <u>United States v. Camacho</u>, 661 F.3d 718, 723 (1st Cir. 2011). Therefore, the Fourth Amendment requires suppression of evidence that is the product of an unlawful search or seizure.

### A. Border Search

In his motion to suppress, the defendant claims (1) that the initial stop and seizure was conducted without a warrant, probable cause or reasonable suspicion. <u>See</u> Docket No. 40. In its response, the government first points out that the stop and seizure of the defendant was conducted at the border, or the functional equivalent of the border, and thus, neither individualized suspicion nor probable cause was required. The court agrees and need not go further on this point. <u>See</u> <u>United States v. Ramsey</u>, 431 U.S. 606, 97 S.Ct. 1972 (1977); <u>United States v. Perez Rivera</u>, 247 F.Supp.108 (D.P.R. 2003) (discussing what is commonly referred to as the "border search exception" under the Fourth Amendment); <u>see also</u> <u>United States v. Beras</u>, 183 F.3d 22, 26 (1st Cir. 1999) (holding that the border search exception applies to outgoing travelers).

Having examined the evidence presented at the hearing and assessed the credibility of the law enforcement agent that testified during the same, the court finds that the defendant's initial stop, the secondary inspection and cursory search of the defendant's phone constituted a border search for which neither reasonable suspicion nor probable cause was required.

### B. Consent and Delay

The defendant asserts that the waiver of his Miranda rights, the statements made to law enforcement agents thereafter and the consent to search his residence were not made knowingly, freely and voluntarily. He therefore claims that neither the waiver nor the consent to search can "salvage the government's otherwise tainted activities." <u>See</u> Docket No. 40 at 4. His argument hinges on the alleged unreasonable delay in bringing him before a Magistrate Judge, in violation of Federal Rule of Criminal Procedure 5(a).[12] The court discusses each in turn.

---

[12] This rule provides that a defendant who has been arrested within the United States is entitled to be brought "without unnecessary delay before a magistrate judge." Fed.R.Crim.P. 5(a)(1)(A). In the case of a warrantless arrest, "a complaint meeting Rule 4(a)'s requirement of probable cause must be promptly filed in the district where the offense was allegedly committed." Fed.R.Crim.P. 5(a)(1)(c).

### *Waiver and Consent*

"It is a basic principle of Fourth Amendment law … that searches and seizures inside a home without a warrant are presumptively unreasonable." King, 131 S.Ct. at 1856 (internal quotation marks omitted) (citing Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). In Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341 (1914), the Supreme Court adopted the federal exclusionary rule for evidence that was unlawfully seized from a home without a warrant in violation of the Fourth Amendment. See Hudson v. Michigan, 547 U.S. 586, 590 (2006). Therefore, exclusion of the evidence obtained by a warrantless search vindicates a citizens' entitlement under the Fourth Amendment to shield their persons, houses, papers, and effects from the government's scrutiny. Id. at 593.

Notwithstanding, "[t]he Fourth Amendment does not forbid any and all warrantless incursions on the person and property of an individual." United States v. Gamache, 792 F.3d 194, 198 (1st Cir. 2015). "Although a warrantless entry into an individual's residence is presumptively unreasonable, a valid consent to the entry by a person with apparent authority vitiates any Fourth Amendment concern." Id. (citations omitted). "Proof of valid consent requires that the prosecution show, by a preponderance of the evidence, that the consent was knowingly, intelligently, and voluntarily given." United States v. Marshall, 348 F.3d 281, 285-286 (1st Cir. 2003) (citing United States v. Perez-Montanez, 202 F.3d 434, 438 (1st Cir. 2000)). "Whether consent was voluntary or the result of coercion is a question of fact to be determined from an examination of the totality of circumstances." Marshall, 348 F.3d at 286 (internal citations omitted).

Here, the evidence shows that SA Colon read the defendant his Miranda rights and provided him with a waiver form (in Castro-Correa's native language, Spanish), which also informed him of said rights. The defendant acknowledged that he understood them and agreed to waive them, both orally and through his signature on the form. By signing it, he expressly accepted the voluntary nature of the waiver, as well as the absence of coercion or threat of any kind. The same goes for the consent to search form he signed approximately two hours into the interrogation. What is more, Castro-Correa has presented no evidence of punishment, threats, violence or official tactics of any kind used by the agents to pressure him to confess or otherwise incriminate himself. In fact, the motion to suppress does not even indicate which of the several statements made by the

defendant ought to be suppressed. This lack of adequate briefing further dooms the defendant's request.

After examining the totality of the circumstances present in this case, the court finds that his waiver and consent to search were voluntarily made. For that reason, too, the court concludes that the search of his house was valid.[13]

### *Unreasonable delay*

As noted earlier, the defendant claims that there was an unreasonable delay in bringing him before a Magistrate Judge. This, he argues, invalidates all the evidence seized following his arrest. See Docket No. 40.

In its response, the government points out that Castro-Correa's waiver, self-incriminating statements and consent to search his residence occurred during the safe harbor period, a Congress-created exception which provides for the admissibility of self-incriminating statements made within six hours of a defendant's arrest. See Docket No. 49 at 10. The government's response also sets forth a detailed account of the events that transpired from the time the defendant was read his Miranda rights until he was brought before a Magistrate Judge. Based on the circumstances highlighted therein, the government concludes that the delay which Castro-Correa complains of was not unreasonable. The court agrees.

The evidence on record shows that the agents who carried out the border search found evidence implicating Castro-Correa in illegal dogfighting activity at approximately 6:30 p.m.[14] Within the next five minutes, SA Colon read Castro-Correa his Miranda rights and obtained an oral and written waiver from him. The evidence also shows that Castro-Correa consented to the search of his residence between 8:30 and 9:30 p.m. Therefore, the incriminating statements made by him between 6:35 p.m. and 12:35 p.m., fall well within the safe harbor provision and need not be suppressed. See United Sates v. Jacques, 744 F.3d 804, 813 (1st Cir. 2014) (noting that "Congress enacted 18 U.S.C. § 3501 to create a safe harbor period for certain voluntary confessions…" and that "its six-hour cut-off shall not apply in any case in which the delay in bringing such person before such magistrate judge … is found by the trial judge to be reasonable

---

[13] Alternatively, the court finds that the initial search conducted by the agents constituted a security or protective search, and that the comprehensive search of Castro-Correa's home was conducted after SA Colon secured the warrants signed by Magistrate Judge McGiverin on Saturday, March 5, 2016. See Section I, page 5, of the instant Opinion and Order.

[14] And as previously noted, the authority for that secondary border search is well-established.

considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer.")

Also, the record evinces Magistrate Judge McGiverin's probable cause determination was made within a 48-hour window of the warrantless arrest, a fact that weighs heavily against any finding of unreasonableness in the supposed delay. To quote the government, "while the determination … was not immediate, it was prompt." Docket No. 49 at 12. Furthermore, because the defendant was arrested on a Friday, he was brought before a Magistrate Judge on Monday, March 7, 2016, which was the next working day. See United States v. Salivas-Gonzalez, 147 F.Supp.2d 58, 60 (D.P.R. 2001) (noting that pursuant to the Local Rules of the U.S. District Court for the District of Puerto Rico, the court "is not open for business on the weekends and, consequently, no court personnel is available to physically process persons arrested over the weekend… Nonetheless, subsequent to a warrantless arrest in felony cases,…, [t]he initial appearance of the defendant is normally conducted on the next working date.").

After considering the circumstances of the defendant's arrest, the fact that business hours had resumed at that time, the limited personnel available to carry out the search of the defendant's residence, and the distances traveled by SA Colon to receive authorization for the arrest and search from the U.S. Attorney's Office and the Magistrate Judge, the court finds that the delay was reasonable. See Jacques, 744 F.3d at 813.

In light of the foregoing reasons, the defendant's motion to suppress (Docket No. 40) is hereby **DENIED.**

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, June 12, 2017.

S/ JUAN M. PÉREZ-GIMÉNEZ
**JUAN M. PEREZ-GIMENEZ**
**SENIOR U.S. DISTRICT JUDGE**